ARMSTRONG, P. J.
*516 Defendant appeals a judgment of conviction, entered after a trial before the court, for eight counts of attempted aggravated murder, seven counts of first-degree burglary, two counts of fourth-degree assault, and one count each of first-degree rape, first-degree unlawful sexual penetration, first-degree sexual abuse, attempted first-degree sodomy, first-degree kidnapping, strangulation, menacing, attempted first-degree assault, and unlawful use of a weapon. Those charges, among others, were brought against defendant in a single indictment that did not expressly allege a connection between the charges that demonstrated the charges could *393 be joined in a single indictment, ORS 132.560. On appeal, defendant argues that the basis for joining the charges was not apparent from the face of the indictment and, thus, the trial court erred in denying his demurrer to the indictment. Defendant also argues on appeal that the trial court erred when it denied his motion for judgment of acquittal on the burglary counts and further erred when it entered guilty verdicts on those counts.
For the reasons that follow, we conclude that, under State v. Poston , 277 Or.App. 137, 370 P.3d 904 (2016), adh'd to on recons. , 285 Or.App. 750, 399 P.3d 488, rev. den. , 361 Or. 886, 403 P.3d 761 (2017), the trial court erred in denying defendant's demurrer to the indictment. However, we also conclude that, except with respect to the unlawful use of a weapon conviction, that error was harmless. We further conclude that defendant failed to preserve his challenge to the burglary convictions that he now raises on appeal and, therefore, we reject those assignments of error. Accordingly, we reverse defendant's conviction for unlawful use of a weapon, remand for resentencing, and otherwise affirm.
For purposes of reviewing the denial of a motion for judgment of acquittal (MJOA), we view the facts in the light most favorable to the state to determine whether "a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." State v. Bilsborrow , 230 Or.App. 413, 415, 215 P.3d 914 (2009). Additionally, for purposes of determining whether an erroneous joinder of charges in an indictment is harmless, as discussed under *517 Poston , we look at the evidence the state presented at trial in support of its case. 277 Or.App. at 146, 370 P.3d 904. With those standards in mind, the relevant facts are as follows.
In June 2013, 18-year-old M was living with her mother, Dean, and her 14-year-old brother, D. M's cousin, Harris, also stayed at the house, but he "didn't really stay there a lot." M's friend J also slept at the house frequently.
Harris and defendant had been roommates until they lost their apartment. After that, defendant stayed with his girlfriend. On June 24, after an argument, defendant's girlfriend told defendant that he could no longer stay at her place, and she dropped defendant off at Dean's house with his duffel bag. Neither M nor Dean had met defendant or knew that he had been in their house on June 26 before the events that occurred in the early hours of June 27.
On June 26, M and Dean were out of the house for most of the day. It was Harris's 21st birthday, and he threw a party at the house while M and Dean were gone, without their knowledge. Dean would not have allowed a party at her house, if she had known about it. By the time that M and Dean returned home, at about 11:00 to 11:30 p.m., the party had ended, and J, D, and M's "cousin" W were the only people at the house. Dean took some extra-strength Tylenol and went to bed. Later, D and W left the house. After they left, M and J watched some movies, had sex, and then fell asleep on the living room couch while watching TV. When she fell asleep, M was wearing only a shirt and bra and was covered with a blanket.
Around 5:00 or 5:30 am, M awoke to the sound of the front door slamming, but she did not look up because she assumed that it was Harris or D. Defendant, whom M had never before met, pulled the blanket off of M and dragged her off of the couch by her hair. M ran up the stairs towards Dean's room, but defendant followed her and dragged M by her hair into M's bedroom. M screamed at defendant to get away from her, but no one else in the house heard her. Defendant got on top of M and held her arms down while he penetrated her vagina with his penis. M fought defendant, hitting him in the face and splitting his lip. Defendant *518 slapped and choked M, and he tried to put his penis in M's mouth. During that struggle, M was able to break free and ran into Dean's room.
Dean woke up to M jumping on the bed and asking for help. Both Dean and M ran out of the house past defendant and got in Dean's SUV and locked the doors. When Dean tried to drive away, defendant jumped onto the side of the SUV. After a struggle between defendant and Dean during which Dean got out of the SUV, M was able to get in the driver's seat and drive in a manner *394 that got defendant off of the side of the SUV. Defendant then obtained a gun and shot out the back window of the SUV.
M drove away and turned the corner, where she encountered a police officer. She slowed down and yelled to the officer that defendant had shot at her and was trying to kill her, and then "sped away." She drove a few blocks further and stopped for a short time to cry but, because she was worried about Dean and D, she returned to the house. When M arrived, the police were at the house investigating. Dean took M to M's grandfather's house and then M's grandfather brought M back to Dean's house to speak to the police. At that time, the police already had defendant in custody. M identified defendant as the man who had attacked her. Later, the police obtained a photograph that had been taken at Dean's house on June 26 that included defendant, Harris, W, and M's dog. Both M and Dean explained that they had not known that defendant had been at their house earlier in the day on June 26. Police also found defendant's duffel bag in a room upstairs in the house.
Defendant was charged in a single indictment with 41 offenses. Defendant demurred to the indictment, arguing that the charged crimes had been improperly joined in the indictment under ORS 132.560. The trial court denied the demurrer. Defendant waived his right to a jury trial, and the case was tried to the court. After the close of the state's evidence, defendant moved for a judgment of acquittal on the burglary counts, which the trial court denied. At the end of trial, the trial court convicted defendant of eight counts of attempted aggravated murder with a firearm, seven counts of first-degree burglary, two counts of fourth-degree assault, *519 and one count each of first-degree rape, first-degree unlawful sexual penetration, first-degree sexual abuse, attempted first-degree sodomy, first-degree kidnapping, strangulation, menacing, attempted first-degree assault with a firearm, and unlawful use of a weapon with a firearm.
On appeal, defendant assigns error to the trial court's denial of his demurrer, denial of his MJOA on the burglary counts, and entry of guilty verdicts on the burglary counts. We first address the trial court's denial of the demurrer.
As stated above, the state brought one indictment against defendant, alleging 41 counts of criminal conduct. Specifically, the indictment alleged 20 counts of attempted aggravated murder with a firearm, nine counts of first-degree burglary, two counts of fourth-degree assault, two counts of strangulation, and one count each of first-degree rape, first-degree unlawful sexual penetration, first-degree sexual abuse, attempted first-degree sodomy, first-degree kidnapping, menacing, attempted first-degree assault with a firearm, and unlawful use of a weapon with a firearm. The indictment alleged in each count that the crime had occurred on June 27, 2013, in Multnomah County, and, except for the burglary counts, each count named M as the victim of the crime. Each of the 20 counts of attempted aggravated murder also alleged that defendant committed or attempted to commit one of the following crimes: first-degree burglary, fourth-degree assault (two counts), strangulation (two counts), first-degree rape, first-degree unlawful sexual penetration, first-degree sodomy, first-degree kidnapping, or menacing.[1] Each of the nine first-degree burglary counts alleged that defendant had the intent to commit one of the following crimes: first-degree rape, attempted first-degree sodomy, first-degree sexual penetration, first-degree kidnapping, fourth-degree assault (two counts), strangulation *520 (two counts), or menacing. The indictment, however, did not allege any other connection among the 41 counts.
Defendant argues on appeal, as he did below, that the indictment does not conform to the requirements of ORS 132.560 and, *395 thus, the trial court erred in denying his demurrer to the indictment.[2]
ORS 132.560 provides, in part:
"(1) A charging instrument must charge but one offense, and in one form only, except that:
" * * * * *
"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:
"(A) Of the same or similar character;
"(B) Based on the same act or transaction; or
"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."
Defendant argues that the indictment did not conform to those requirements because it described each offense only in the words of the statute for that offense and did not allege that the various offenses are "of the same or similar character," "based on the same act or transaction," or "connected together or constituting parts of a common scheme or plan."
Under ORS 132.560, an indictment must, on its face, state the basis for joinder of the charged crimes, "whether by alleging the basis for joinder in the language of the joinder statute or by alleging facts sufficient to establish compliance with the joinder statute." Poston , 277 Or.App. at 144-45, 370 P.3d 904. As we have explained, "[e]ven if the state chooses not to use the exact joinder language of ORS 132.560(1)(b)(C), the state must nevertheless use some language specifically connecting the crimes together, or specifying the crimes' common *521 scheme or plan." State v. Marks , 286 Or.App. 775, 782, 400 P.3d 951 (2017).
Here, the charges that, on the face of the indictment, are "of the same or similar character" could be properly joined with each other in a single indictment-viz. , the attempted aggravated murder charges could be joined together, the first-degree burglary charges could be joined together, and, based on the allegations supporting the charges, the four sexual offenses could be joined together. However, there is no language in the indictment that connects all 41 charges together in a manner permitted by ORS 132.560. Although each of the attempted aggravated murder and burglary charges corresponds to another crime alleged in the indictment, it is not readily discernible that all of the various charges that were of a different character-including the sexual offenses, assault, kidnapping, strangulation, menacing, and unlawful use of a weapon-were based on the same act or transaction or were connected together or part of a common scheme or plan. Because the indictment fails to comply with ORS 132.560, the trial court erred in denying defendant's demurrer to the indictment.
That conclusion does not end our inquiry. We must next determine whether the trial court's error had little likelihood of affecting the verdict and, thus, was harmless. Poston , 277 Or.App. at 145, 370 P.3d 904. In Poston , we explained that "whether improper joinder of charges affected the verdict depends on whether joinder led to the admission of evidence that would not have been admissible but for the [erroneous] joinder * * * and, if so, whether that evidence affected the verdict on those charges." Id . That analysis requires us to determine whether "all of the evidence that was admitted at trial to prove other, improperly joined, charges would 'have been admissible' in a hypothetical trial on the charge or group of charges alone." State v. Clardy , 286 Or.App. 745, 771, 401 P.3d 1188, adh'd to as modified on recons. , 288 Or.App. 163, 406 P.3d 219 (2017) (quoting Poston , 277 Or.App. at 145, 370 P.3d 904 ). We have explained that
"[o]ur analysis in Poston demonstrates that evidence presented at trial on erroneously joined charges would be 'admissible,' as we used that term in Poston , in a *522 hypothetical trial on each charge or *396 properly joined group of charges, only when (1) each item of evidence that was actually presented could have been admitted in the hypothetical trial under a legally correct evidentiary analysis and (2) it is implausible that, had the defendant objected under OEC 403 or raised some other objection invoking the trial court's discretion, the trial court would have excluded that evidence in the hypothetical trial."
Id. at 772-73, 401 P.3d 1188.
Here, the state's evidence for all of the counts was that defendant entered M's home, dragged M off of the couch by her hair and up the stairs into M's room. Then defendant held M down on her bed, where defendant penetrated her vagina with his penis, choked her, slapped her, and attempted to put his penis in M's mouth. After M got away from defendant, out of the house, and into her mother's SUV, defendant followed her and attempted to stop her from driving away by jumping on the side of the SUV. When M's driving got defendant off of the SUV, he fired a gun at her through the back window of the SUV. All of those events happened in a short time frame. The sexual offenses, strangulation, kidnapping, fourth-degree assault, and burglary counts all stemmed from the actions of defendant inside M's home. The attempted aggravated murder, attempted first-degree assault, menacing, and unlawful use of a weapon counts all stemmed from defendant firing a gun at M. The attempted aggravated murder counts also had as an element of each count one of the offenses that occurred inside the home.
Looking at the evidence in that light, all of the evidence would have been cross-admissible in any single trial for each of the offenses occurring inside the home and each of the attempted aggravated murder counts. With regard to the offenses occurring inside the home, defendant engaged in a course of conduct toward M that began as soon as he entered the home and unfolded over a short period of time, with all of the evidence for those offenses overlapping. That evidence would have been cross-admissible in any trial for one of those offenses as necessary context for defendant's actions and as relevant to his motive in or plan for committing each of them. With regard to the attempted aggravated *523 murder counts, an offense inside the home was an element of the crime in each of those counts, each of which was based on the same conduct of defendant firing the gun at M, and thus, all of the evidence also would have been cross-admissible for all of the attempted aggravated murder counts. Finally, the evidence of defendant following M outside and eventually firing a gun at her would have been admissible in trials for the offenses occurring inside the home, because that conduct occurred in an effort to flee from or conceal those crimes, which is relevant evidence of defendant's state of mind. State v. Walsh , 288 Or.App. 331, 338, 406 P.3d 152 (2017) (citing State v. Minchue , 173 Or.App. 520, 524, 24 P.3d 386 (2001) ). Thus, the evidence for each of those offenses would have been "admissible" as that term was explained in Clardy , and it is implausible that a trial court would have excluded any of that evidence on discretionary grounds.
It is less clear that the evidence for the offenses occurring inside the home would have been admissible in a stand-alone trial on the menacing or attempted first-degree assault counts, both of which were based on defendant's conduct of firing the gun at M. However, the evidence of what occurred prior to defendant shooting the gun at M was admissible to show defendant's motive. In addition, the evidence that defendant had just assaulted and raped M when she fled and when he fired a gun at her would have been relevant to show that defendant had a motive to and thus intended to "cause[ ] serious physical injury to [M] by means of a deadly or dangerous weapon," ORS 163.185 (first-degree assault), and intended to attempt to place M "in fear of imminent serious physical injury," ORS 163.190 (menacing). Because of that relevance, which goes to the heart of the elements of those offenses, we also conclude that it is implausible that the trial court would have excluded that evidence on discretionary grounds.
Finally, we address defendant's conviction for unlawful use of a weapon, *397 ORS 166.220.[3] With respect to that count, we conclude that at least some of the evidence bearing on all *524 of the other offenses would not have been admissible in a trial on solely that count, or, if admissible, given the nature of defendant's other offenses against M, then it is plausible that the trial court would have excluded at least some of that evidence on discretionary grounds, and the admission of that evidence had a likelihood of affecting the verdict. Hence, the trial court's error in denying defendant's demurrer was not harmless with respect to defendant's unlawful use of a weapon conviction, and we reverse it.
Because our disposition on the demurrer leaves in place defendant's burglary convictions, we turn to defendant's assignments of error pertaining to those convictions. With respect to those convictions, defendant argues that the trial court erred in denying his MJOA at the close of the state's case and erred in entering guilty verdicts on the burglary counts.
A person commits first-degree burglary if the person "enters or remains unlawfully" in a dwelling "with intent to commit a crime therein." ORS 164.225 ; ORS 164.215. To "enter or remain unlawfully" is defined as "[t]o enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the entrant is not otherwise licensed or privileged to do so." ORS 164.205(3)(a).[4]
Here, after the state rested its case, defendant brought an MJOA on the burglary counts, arguing that the state had presented insufficient evidence that defendant had had the requisite criminal intent when he entered the house. In response, the state argued that the evidence showed that defendant had criminal intent upon his unlawful entry into the house, and also told the court that there was not a factual issue about unlawfully remaining in the *525 case. However, in the course of the colloquy with the court, the state referred to State v. J. N. S. , 258 Or.App. 310, 308 P.3d 1112 (2013), and State v. Pipkin , 354 Or. 513, 316 P.3d 255 (2013), representing to the court that Pipkin had over-ruled the holding in J. N. S. that the criminal intent had to be formed at the time of entry because Pipkin discussed that there are two ways to commit a burglary, either "stepping over the threshold with the intent to commit a crime therein, or remaining there within with the intent to commit a crime therein." Defendant disagreed that Pipkin applied to the intent element of burglary and argued that, as stated in J. N. S. , the intent had to be present at the time of the alleged trespass. The court denied defendant's MJOA, stating that it had reviewed the cases and that, "viewing the evidence in the light most favorable to the State, there is sufficient evidence on all the counts to survive a motion for judgment of acquittal."[5]
At the end of trial, the state again argued that the burglary counts were based on defendant unlawfully entering and having a criminal intent upon entry. After the state's closing, the trial court asked the state to address the legal issue on intent for the burglary charges that had been discussed before. The state responded that, under Pipkin , "the intent can be formed while he's inside * * * even assuming that [he has lawfully *398 entered], while he's in there, * * * he gets the requisite intent to commit a crime therein[,] that becomes the burglary." The state then went on to explain that that fact scenario was not at issue here because "[n] obody who had any authority had invited him to be here * * * [and because i]t happened so quickly that there's no other time, other than (inaudible) where he is stepping over the threshold that he would have informed [sic ] that intent." Nonetheless, the following exchange then occurred:
*526 "THE COURT: And so then, are you saying that somebody could lawfully enter the residence, if they might have had permission [from] somebody who could give them permission, but then they could still commit a burglary if, after they entered, they then formed an unlawful intent, or they
"[THE STATE]: Right. And then-I think Pipkin takes us back to what burglary law was before the J. N. S. case, where if I have a party, I invite people over, they're all here lawfully, if there's somebody who then goes in to the bathroom and they find my elderly mother's narcotic pain killer because she's dying of cancer, and they steal that, they came in lawfully, they were lawfully, but when they exceed their scope as a guest and they commit a crime of theft, it becomes a burglary. And I do think Pipkin takes us back to that state of the law."
In his closing, defendant did not renew his MJOA; rather, defendant stated:
"Briefly, I guess as it pertains to intent entering the house, the state is asking you to speculate[.] * * *. And this pertains to two cases that we've referred in this-throughout this day, J. N. S. and Pipkin . It's still my position that Pipkin is a different issue. It's talking about a different issue, and it doesn't even refer to J. N. S . You know, if you're going to overturn case law at the Supreme Court level, then you say, [ J. N. S . ] is no longer good law. That's how opinions read. So it's my position that it is still the law, they're talking about two different issues, but that's not really my point in this case anyways."
The court then returned its verdict of guilty on the burglary counts without comment on the legal issue, and defendant did not otherwise object or seek a ruling on that legal issue.
As noted above, defendant assigns error to the trial court's denial of his MJOA and its entry of guilty verdicts on the burglary counts. With respect to both of those assignments of error, defendant argues that there was a factual dispute as to whether defendant was permitted or privileged to enter Dean's house. Defendant then asserts that the trial court may have failed to resolve that factual dispute because the state incorrectly argued that the law permitted the court to find that defendant had "remained *527 unlawfully" if he formed a criminal intent after entering lawfully. See State v. Werner , 281 Or.App. 154, 168, 383 P.3d 875 (2016), rev. den. , 361 Or. 312, 393 P.3d 1173 (2017) ("[T]he commission of a crime does not, in and of itself, convert a lawful entry into an unlawful remaining."). Defendant argues that the trial court probably accepted the state's incorrect statement of the law, and argues that "[t]he court's misunderstanding therefore may have led the court to convict defendant of the burglary charges on a legally incorrect theory. For that reason, the court erred in denying defendant's motions for judgment of acquittal on the burglary counts, and in entering guilty verdicts on those counts."
As explained below, we reject the argument now advanced by defendant. As set out above, during argument on the MJOA, defendant only asserted that the state had failed to present sufficient evidence that defendant had the requisite criminal intent at the time that he entered Dean's home. In defending against that motion, the state solely advanced a theory of burglary based on defendant entering the Dean home unlawfully with the requisite intent. Although the court and the parties may have discussed the current state of the law with respect to what constitutes unlawful remaining, that question was not before the court, and defendant never asked the court to make a ruling as to what the law is in that regard. As a result, the legal issue that defendant now argues on appeal was not *399 ruled on by the court with respect to the MJOA.
Likewise, defendant did not raise at the end of the trial the issue that he now advances on appeal. Although the court and the state again discussed what constitutes unlawful remaining under the case law, the state told the court that that fact scenario was not before the court and reiterated that it was advancing a theory that defendant had unlawfully entered the home with the requisite intent. In response to the court's and the state's colloquy, defendant did not ask for a ruling on the legal issue that he advances on appeal. Rather, defendant asserted that the state of the law on that issue was "not really my point in this case." Additionally, after the court returned guilty verdicts on the burglary counts without comment, defendant did not object *528 or otherwise seek a ruling on what constitutes unlawful remaining under the burglary statute. In short, defendant did not present the issue that he now raises on appeal such that the court could consider and correct any legal error. Rather, at trial, both the state and defendant told the court that the issue of unlawful remaining-viz. , whether defendant could be convicted based on his having formed the requisite criminal intent after entering the house-was not a factual issue in the case. Thus, under the circumstances of this case, we decline to address the legal issue that defendant now contends that the trial court misapprehended. See, e.g. , State v. Geyer , 287 Or.App. 25, 33-34, 401 P.3d 1259, rev. den. , 362 Or. 208, 407 P.3d 816 (2017) (defendant did not preserve issue where presentation of issue in closing argument did not fairly apprise the court that defendant sought a ruling and deprived the state a fair opportunity to address it).
Conviction for unlawful use of a weapon reversed; remanded for resentencing; otherwise affirmed.

Ten of the counts of attempted aggravated murder alleged, with respect to each of the crimes set out above, that defendant attempted to cause the death of M "in the course of and in the furtherance of and in immediate flight from the crime that defendant was committing and attempting to commit." The other 10 counts of attempted aggravated murder alleged, with respect to each of those crimes, that defendant attempted to cause the death of M "in an effort to conceal the commission and identity of [the] perpetrator of the crime."

ORS 135.630(2) permits a defendant to demur to an indictment "when it appears upon the face thereof" that the indictment "does not substantially conform to the requirements of ORS 132.510 to ORS 132.560."

ORS 166.220 provides, in relevant part, as charged in this case:
"(1) A person commits the crime of unlawful use of a weapon if the person:
"(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015."

ORS 164.205 has been amended since the conduct that gave rise to the charges in this case occurred, see Or. Laws 2015, ch. 10, § 1. However, the amendment does not affect our analysis, and, thus, we refer to the current version of the statute.

We recently resolved the legal issue of the effect of Pipkin on our decision in J. N. S. In State v. McKnight , 293 Or.App. 274, 278, 426 P.3d 669 (2018), we explained that Pipkin did not overrule the holding in J. N. S. that, to commit burglary, the defendant must have the requisite intent to commit a crime at the time of the trespass. However, we also acknowledged that the statement in J. N. S. that to "remain unlawfully," for purposes of the burglary statute, requires the defendant to first enter lawfully is incorrect in light of the Supreme Court's statements in Pipkin that " 'a person can commit burglary by entering unlawfully or by remaining unlawfully or by entering and remaining unlawfully.' " Id. at 280, 426 P.3d 669 (quoting Pipkin , 354 Or. at 523, 316 P.3d 255 ).